IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH THE
CELLULAR DEVICES ASSIGNED CALL
NUMBERS:

(617) 312-2934, THAT IS STORED AT
PREMISES CONTROLLED BY VERIZON
("TARGET TELEPHONE #1).

Case No. 20-mj-6156-MPK

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, **Shena Latta**, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for

information associated with a certain cellular telephone:

> a.   Target Telephone #1 ("TT1") assigned call number (617) 312-2934, that is
>
> stored at premises controlled by Cellco Partnership d/b/a Verizon Wireless
>
> ("Verizon" or "Verizon Wireless"), a wireless telephone service provider
>
> headquartered in New Jersey, and that accepts service of process at
>
> Verizon Wireless, 180 Washington Valley Road, Bedminster, NJ 07921.
>
> Records subpoenaed from Verizon indicate that the phone is subscribed in
>
> the name of Marilyn Golisano of Everett, Massachusetts and has been
>
> registered in that name at all relevant times. The information to be
>
> searched is described in the following paragraphs and in Attachment A-1.
>
> This affidavit is made in support of an application for a search warrant
>
> under 18 U.S.C. § 2703(c)(1)(A) to require Verizon Wireless to disclose to

the government copies of the information further described in Section I of

Attachment B-1.

Upon receipt of the information described in Section I of Attachment B, government-authorized

persons will review the information to locate items described in Section II of Attachment B for

the Target Telephone.

2.      I am a Special Agent with the Department of Justice, Office of the Inspector

General, and have been so employed since September 4, 2018.  Prior to this, I served as a Special

Agent with the Social Security Administration, Office of the Inspector General for three years

and as a Special Agent with the United States Secret Service for over ten years. I am currently

assigned to the Boston Area Office and investigate matters related to public corruption as well as

those involving fraud, waste and abuse within the Department of Justice. I completed the Federal

Law Enforcement Training Center's Criminal Investigator Training Program in Glynco, GA and

the United States Secret Service Special Agent Training Academy in Beltsville, MD.  I have also

received on-the-job training and attended training courses sponsored by multiple federal agencies

related to these types of investigations. I have been involved in many complex investigations.  I

have interviewed defendants, witnesses and victims. I have conducted surveillance, worked with

confidential informants, and participated in investigations using court authorized interception of

wire and electronic communications.  During my law enforcement career, I have also

participated in the preparation and execution of search and arrest warrants.  Based upon my

training and experience, I am familiar with methods of communication of individuals conducting

illegal activity, which include the use of cellular phone communication and records.  The facts in

this affidavit come from my personal observations, my training and experience, information

obtained from subpoenas, public records, other agents, and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of: (1) 18 U.S.C. §666, embezzlement from an agency receiving federal funding; (2) 18 U.S.C. §1343, wire fraud; and (3) Aggravated Identity Theft, in violation of 18 U.S.C. §1028A, have been committed by Marilyn GOLISANO ("GOLISANO").  There is also probable cause to search TT1 for the information described in Attachment A1 for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B1.

**Marilyn GOLISANO**

4.      From at least 2016 through March of 2019, GOLISANO was employed by The Boston Police Department as a clerk for the District A-1 Detectives Unit.

5.      District A-1 is among the largest and busiest districts in Boston.  It is located at 40 New Sudbury Street and covers Bay Village, Chinatown, Beacon Hill, the Financial District, the Theater District, the Leather District, the North End, the West End, and the Charlestown areas of Boston.

6.      GOLISANO's duties included assigning cases, answering phones, doing payroll, data entry, and other tasks supporting the work of District A-1 Detectives.

7.      Also included in GOLISANO's duties was the "batching" of overtime slips for employees of the District A-1 Detectives Unit.

8.      "Batching" involved collecting, reviewing, and organizing all of the District A-1 Detectives Unit overtime slips, including her own, for submission to BPD's payroll department.

9.      This meant that GOLISANO was often, if not always, the last person to collect and review overtime slips from the District A-1 Detectives Unit before they were submitted to the payroll department.

### GOLISANO's Overtime Hours

10.     From at least 2016 through March of 2019, GOLISANO was employed as a clerk for the District A-1 Detectives Unit.  GOLISANO's regular schedule was from Monday through Friday, from 8 a.m. to 4:00 p.m., with a one hour unpaid lunch, for a total of thirty-five hours per week.  During her tenure as the clerk for the District A-1 Detectives Unit, GOLISANO would routinely be approved to work a four hour overtime block on Sundays, ordinarily from 7:30 a.m. through 11:30 a.m.   During this time, GOLISANO would be responsible, among other things, for insuring that cases opened over the weekend were entered into the BPD's computer system and assigned to detectives.

11.     From time to time, GOLISANO would also be approved to perform overtime shifts on other occasions during the week at the conclusion of her regular shift, from 4:00 p.m. to as late as 8:00 p.m.[1]   This weekday overtime would include assisting District A-1 command staff with special projects, and, occasionally, was approved to allow GOLISANO to catch up on work.

12.     According to GOLISANO's supervisor, Lieutenant Detective Charles WILSON, overtime shifts for days other than Sunday were uncommon, and he does not recall approving such overtime more than one or two days in a month.

---

[1] Occasionally these shifts were two hours rather than four hours.

**Lieutenant Detective Charles WILSON**

13.     Lieutenant Detective Charles WILSON ("WILSON") was the Detective Commander for District A-1 and supervised all of the District A-1 Detectives during the times relevant to this Complaint.

14.     WILSON supervised the work of GOLISANO and was the individual responsible for approving overtime hours worked by her.  WILSON was the supervisory official who would sign GOLISANO's overtime slips.[2]

15.     In the Spring of 2019, WILSON was notified by another member of BPD's Command Staff that District A-1 had an unusually high number of overtime hours for "community meetings."[3]

16.     WILSON contacted the BPD payroll department and requested a printout of all of the "community meeting" overtime hours that had been paid to District A-1 employees since July of 2018.

17.     Upon reviewing the printout, it was immediately apparent to WILSON that the number of overtime hours for which GOLISANO had been paid vastly exceeded the number of

---

[2] On dates when WILSON was not available, other supervisors could sign for GOLISANO's overtime.  This appears to have been uncommon.  Even where other supervisors may have signed GOLISANO's slips, only WILSON authorized GOLISANO to perform overtime hours.

[3] In District A-1, community meetings generally involved discussions with members of the community about concerns with crime in their neighborhoods.  These meetings were attended by Lt. Wilson or District A-1 Sergeants.

overtime hours that he had approved, and further, that she had been improperly coding her overtime hours under the code for "community meetings."[4]

**BPD Payroll Records**

18.     The BPD, in the usual and regular course of its business, maintains payroll records for each of its employees.   These records can be retrieved for individual employees going back several years.

19.     In connection with this investigation, I have obtained BPD payroll records documenting the overtime hours for which GOLISANO has been paid over the last several years and which reflect the hours she worked, took vacation, personal, and other leave time.

20.     As explained below, GOLISANO's overtime records reflect a dramatic increase in overtime hours and overtime pay beginning in June 2016.

21.     A summary of those records is attached hereto as **<u>Exhibit 1</u>**.  That summary, reveals, among other things:

22.     In 2015, GOLISANO was paid for a total of 306 overtime hours.  This equated to $12,888.72 in overtime pay for that year (at a rate of approximately $42 per hour).  During the year, GOLISANO performed between four and seven overtime shifts per month.

23.     In 2016, GOLISANO was paid for a total of 348 overtime hours.  This equated to $15,096.24 in overtime pay for that year (at a rate of approximately $43 per hour).  From January through May of 2016, GOLISANO performed between four and five overtime shifts each month.

---

[4]Beginning in approximately April 2015, GOLISANO began submitting overtime slips listing the code "233" as the overtime code.  That is the code for "Community Meetings."   According to GOLISANO's supervisors, GOLISANO never attended a community meeting on behalf of BPD and was never approved to work overtime to attend a community meeting.

Beginning in June 2016, through the end of that year, however, GOLISANO submitted between twelve, up to as many as sixteen, overtime slips per month.

24.     In 2017, GOLISANO was paid for a total of 610 overtime hours.  This equated to $26,461.80 in overtime pay for that year (at a rate of approximately $43 per hour).  During 2017, GOLISANO submitted between nine, and as many as twenty-two, overtime slips each month.

25.     In 2018, GOLISANO was paid for a total of 754 overtime hours.  This equated to $33,952.14 in overtime pay for that year (at a rate of approximately $45 per hour).  During 2018, GOLISANO submitted between twelve, and as many as twenty, overtime slips each month.

26.     In 2019, GOLISANO submitted sixteen overtime slips for January, twelve overtime slips in February, fourteen overtime slips in March, and 1 overtime slip in April, prior to her retirement, for a total of 168 overtime hours.  This equated to $7,812.00 in overtime pay (at a rate of approximately $46 per hour).

### WILSON's Review of GOLISANO's Overtime Hours
### (Theft of Funds From an Agency Receiving Federal
### Benefits - 18 U.S.C. §666)

27.     According to WILSON, the number of overtime shifts GOLISANO claimed to have worked from January 2015 through May of 2016, *i.e.*, between four and seven overtime shifts, is consistent with the number of overtime shifts that WILSON approved for GOLISANO.

28.     With the possible exception of a one month period in 2018, when WILSON was preparing a report for command staff, WILSON does not believe he approved more than seven overtime shifts for GOLISANO in any month.

29.     WILSON did not approve the very large and continuing increase in overtime shifts observed from June of 2016 onward (an increase from four to seven shifts per month to sometimes more than twenty shifts per month).  Despite GOLISANO's overtime responsibilities,

duties, and workload, largely remaining constant, the overtime hours for which GOLISANO was paid almost doubled in 2017, and more than doubled in 2018.

30.     In 2017, GOLISANO was paid for 610 overtime hours.  This is 258 hours more than WILSON approved.[5]  At the rate that GOLISANO was paid in 2017, there is probable cause to believe that GOLISANO was overpaid approximately $11,094 for overtime hours that were not approved.

31.     In 2018, GOLISANO was paid for 754 overtime hours, some 402 overtime hours more than WILSON approved.  At the rate that GOLISANO was paid in 2018, there is probable cause to believe that GOLISANO was overpaid approximately $18,090 for overtime hours that were not approved.

---

[5]Favorably assuming GOLISANO had been properly approved for fifty two four hour overtime shifts on Sundays and three additional weekday overtime shifts per month for all of 2017 and 2018, and further assuming that all of her shifts were four hours long, that would have totaled 352 overtime hours for each year.

**WILSON's Review of Signatures on GOLISANO's Overtime Slips**
**(Wire Fraud – 18 U.S.C. §1343 and**
**Aggravated Identity Theft – 18 U.S.C. §1028A)**

32.     WILSON has reviewed overtime slips submitted by GOLISANO in March of

2019 which were purportedly signed by WILSON.  WILSON identified the following as slips

that do not reflect his signature:

| Date | Overtime Hours | Signature |
|---|---|---|
| 3/5/2019 Tuesday | 4:00 p.m.-8:00 p.m. | Not his signature |
| 3/6/2019 Wednesday | 4:00 p.m.-8:00 p.m. | Not his signature |
| 3/9/2019 Saturday | 4:00 p.m.-8:00 p.m. | Not his signature |
| 3/15/2019 Friday | 4:00 p.m.-8:00 p.m. | Not his signature |
| 3/19/2019 Tuesday | 4:00 p.m.-8:00 p.m. | Not his signature |
| 3/26/2019 Tuesday | 4:00 p.m.-8:00 p.m. | Not his signature |

**Computer Log In / Log Off Times**

33.     BPD maintains a computer system for its employees to access and utilize while

doing work for BPD.

34.     In order to access the BPD computer system, employees must enter a unique

username and password.

35.     In the usual course of its business, BPD maintains records concerning the dates

and times that its employees log into and log out of its computer system.

36.     I have obtained records of the times that GOLISANO logged into and out of the

BPD computer system from June 15, 2015 through the present, and, I have compared the

computer login / log off data to the dates and times for which GOLISANO submitted the above

noted overtime slips in March of 2019.

| Date | Overtime Hours | Log In/ Log Out | Logged In During Overtime Shift |
|------|----------------|-----------------|----------------------------------|
| 3/5/2019 Tuesday | 4:00 p.m.- 8:00 p.m. | 6:23 a.m. to 1:21 p.m.; 1:45 p.m. to 1:50 p.m. | NO 0/240 min |
| 3/6/2019 Wednesday | 4:00 p.m.- 8:00 p.m. | 9:12 a.m. to 1:14 p.m. | NO 0/240 min |
| 3/9/2019 Saturday | 4:00 p.m.- 8:00 p.m. | 10:34 a.m. to 10:38 a.m.; 6:10 p.m. to 6:17 p.m. | YES 7/240 minutes |
| 3/15/2019 Friday | 4:00 p.m.- 8:00 p.m. | 8:16 a.m. to 1:30 p.m. | NO 0/240 min |
| 3/19/2019 Tuesday | 4:00 p.m.- 8:00 p.m. | 8:21 a.m. to 1:24 p.m. | NO 0/240 min |
| 3/26/2019 Tuesday | 4:00 p.m.- 8:00 p.m. | 8:53 a.m. to 1:21 p.m. | NO 0/240 min |

**BPD Payroll Direct Deposits and the Use of Interstate
Wires in Furtherance of the Scheme
(Wire Fraud - 18 U.S.C. §1343)**

37.     Citizens Financial Group, Inc. aka Citizen's Bank, is a bank headquartered in

Providence, Rhode Island, which operates in the Commonwealth of Massachusetts, among other

states.

38.     Citizens operates more than 1,000 branches and over 3,000 ATMs across 11 states

under the Citizens Bank brand.

39.     Representatives of the City of Boston have informed me that Citizens Bank

processes all BPD electronic funds transfers and direct deposits for BPD employees' salaries and

have done so at all times relevant to this Complaint.

40.     I have spoken to and communicated with representatives of Citizens and BPD

concerning how Citizens receives and processes the payroll for BPD.  I have been informed that

among other steps, in order to initiate the payment of BPD payroll, BPD transfers to the City of

Boston a file containing the information about its employees and their hours worked.  The City

of Boston, which controls the salary rates, then electronically transfers a file to Citizens

containing information about the bank and amount of money to be transferred to each employee

for the work performed. This file is received and processed by Citizens in Providence, Rhode

Island.

41.     After the files are processed, deposits are made, from Rhode Island, to the

accounts of the BPD employees in the amounts designated by BPD.

42.     At all times relevant to the events described in this affidavit, GOLISANO was

paid her salary via direct deposit to her account with East Boston Savings Bank ("EBSB").

11

43.     EBSB operates dozens of banks and ATMs in the Commonwealth of Massachusetts.

44.     GOLISANO was aware that her salary, including overtime, was paid to her through direct deposit.[6]

45.     Payroll records reflect that for the one week period beginning March 23, 2019, GOLISANO worked her regularly scheduled hours from Monday through Friday for a total of thirty five hours.  GOLISANO further submitted four overtime slips totaling 14 hours: (1) March 23, 2019 for 4 hours; (2) March 24, 2019 for 4 hours; (3) March 26, 2019 for four hours; and (4) March 28, 2019 for two hours.   At least one of the overtime slips, March 26, 2019, was fraudulent, in that they were not approved or signed by WILSON.

46.     A City of Boston Employee Earning Report for GOLISANO reflects that on April 5, 2019, GOLISANO was paid for thirty-five hours of regular pay and fourteen hours of overtime.   The net amount transferred for those hours on April 5, 2019, after various deductions, was $922.47.

47.     On or about April 5, 2019, GOLISANO received a direct deposit from the City of Boston in the amount of $922.47 in her East Boston Savings Account.

48.     I believe this transfer to have been for the work GOLISANO claimed to have performed from March 23, 2019 through March 29, 2019, including the fraudulent overtime slip.

---

[6] I am informed that it is sufficient for purposes of establishing an interstate nexus that some use of the wires in furtherance was foreseeable (such as a direct deposit banking transaction) and that an interstate wire occurred. *See United States v. Tum*, 707 F.3d 68, 73–74 (1st Cir. 2013).

## BPD Received Federal Benefits

49.    The United States Department of Justice is an agency of the United States.

50.    Among other things, DOJ provides benefits and funding to law enforcement agencies such as the BPD through grants that promote the well-being of Boston residents.

51.    For example, through a federal grant DOJ provided funding for the BPD to subcontract with Massachusetts General Hospital so that clinicians could respond with BPD officers to calls involving individuals with mental health issues.  The program further involved funding to allow a doctor from the University of Massachusetts to study of the referrals and outcomes from the program.  For this program advancing public safety and well-being, DOJ made payments of over $36,000 to BPD between July of 2017 and April of 2018.

52.    The USDOT is an agency of the United States that provides millions of dollars in funding on a yearly basis to law enforcement authorities that enforce traffic regulations on public roadways, including the BPD.

53.    For 2016, 2017, and 2018, BPD received annual benefits from the USDOT in excess of $10,000 which were funded by the USDOT pursuant to numerous federal grants.  This funding included, among other things, grants under the sustained traffic enforcement program ("STEP") which seeks to improve public well-being and public safety through enhanced traffic enforcement at locations where crashes occur most frequently.  Other goals of USDOT traffic enforcement funding include the reduction of motor vehicle fatalities, the reduction of impaired driving related crashes, the reduction of unrestrained vehicle passenger injuries, and, the reduction of pedestrian injuries from distracted driving.

13

**Information Retained by Cellular Providers**

54.     In my training and experience, providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

55.     Based on my training and experience, I also know that wireless providers typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

56.     Based on my training and experience, I know that Verizon also collects per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT").  RTT data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower.  This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

57.     Based upon information made available to federal law enforcement by the wireless providers and information maintained by the DOJ for use by law enforcement; (1) Verizon Wireless routinely maintains up to one year of information relating to the cell towers accessed by a phone.  A preservation request was served on Verizon on 12/11/2019.

58.     Based on my training and experience, I know that wireless providers typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service.  I also know that wireless providers typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the user or users of the Target Telephones and may assist in the identification of co-conspirators.

59.     In my training and experience, individuals who own and use cellphones keep such cellphones on their persons.  Thus, it is reasonable to believe that evidence concerning the location of the cellphone belonging to an individual is relevant to the issue of where the user of that cellphone is located at a given time.

60.     Where, as here, there is probable cause to believe that an individual has falsely claimed to have been present at work performing overtime, evidence of the location of the Target Telephone during the period specified in the warrant is likely to be relevant to establishing whether those claims are true (or false).

## AUTHORIZATION REQUEST

61.    Based on the foregoing, I request that the Court issue the proposed search

warrants, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

62.    I further request that the Court direct Verizon Wireless to disclose to the

government any information described in Section I of Attachment B-1 that is within its

possession, custody, or control.  Because the warrant will be served on Verizon Wireless, who

will then compile the requested records at a time convenient to it, reasonable cause exists to

permit the execution of the requested warrant at any time in the day or night.

63.    I further request that the Court order that all papers in support of this application,

including the affidavit and search warrant, be sealed until further order of the Court.  These

documents discuss an ongoing criminal investigation that is neither public nor known to all of

the targets of the investigation.  Accordingly, there is good cause to seal these documents

because their premature disclosure may seriously jeopardize that investigation, including by

giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior,

notify confederates, and flee from prosecution.

Respectfully submitted,

SA Shena Latta
Special Agent
Department of Justice,
Office of the Inspector General

February 20,

Subscribed and sworn to before me on_____, 2020

M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE

16

| YEARS | MONTH | OT SLIPS | OT HOURS | OT COST |
|-------|-------|----------|----------|---------|
| 2013 | Sep | 1 | 4.00 | $158.84 |
| | Oct | 3 | 13.00 | $516.23 |
| | Nov | 2 | 8.00 | $317.68 |
| | Dec | 2 | 8.00 | $322.40 |
| **2013 Total** | | **8** | **33.00** | **$1,315.15** |
| 2014 | Jan | 1 | 4.00 | $163.56 |
| | Feb | 4 | 16.00 | $654.24 |
| | Mar | 9 | 36.00 | $1,472.04 |
| | Apr | 7 | 28.00 | $1,144.92 |
| | May | 7 | 32.00 | $1,308.48 |
| | Jun | 8 | 38.00 | $1,553.82 |
| | Jul | 7 | 36.00 | $1,472.04 |
| | Aug | 6 | 34.00 | $1,390.26 |
| | Sep | 8 | 40.00 | $1,635.60 |
| | Oct | 6 | 34.00 | $1,390.26 |
| | Nov | 7 | 38.00 | $1,553.82 |
| | Dec | 11 | 50.00 | $2,044.50 |
| **2014 Total** | | **81** | **386.00** | **$15,783.54** |
| 2015 | Jan | 7 | 39.00 | $1,642.68 |
| | Feb | 6 | 29.00 | $1,221.48 |
| | Mar | 7 | 38.00 | $1,600.56 |
| | Apr | 4 | 18.00 | $758.16 |
| | May | 5 | 26.00 | $1,095.12 |
| | Jun | 4 | 24.00 | $1,010.88 |
| | Jul | 4 | 25.00 | $1,053.00 |
| | Aug | 5 | 31.00 | $1,305.72 |
| | Sep | 5 | 24.00 | $1,010.88 |
| | Oct | 4 | 16.00 | $673.92 |
| | Nov | 5 | 20.00 | $842.40 |
| | Dec | 4 | 16.00 | $673.92 |
| **2015 Total** | | **60** | **306.00** | **$12,888.72** |
| 2016 | Jan | 5 | 20.00 | $867.60 |
| | Feb | 4 | 16.00 | $694.08 |
| | Mar | 4 | 16.00 | $694.08 |
| | Apr | 4 | 16.00 | $694.08 |
| | May | 5 | 20.00 | $867.60 |
| | Jun | 12 | 32.00 | $1,388.16 |
| | Jul | 13 | 36.00 | $1,561.68 |
| | Aug | 12 | 32.00 | $1,388.16 |
| | Sep | 12 | 32.00 | $1,388.16 |
| | Oct | 14 | 38.00 | $1,648.44 |
| | Nov | 15 | 42.00 | $1,821.96 |
| | Dec | 16 | 48.00 | $2,082.24 |
| **2016 Total** | | **116** | **348.00** | **$15,096.24** |
| 2017 | Jan | 11 | 34.00 | $1,474.92 |
| | Feb | 10 | 30.00 | $1,301.40 |

| YEARS | MONTH | OT SLIPS | OT HOURS | OT COST |
|---|---|---|---|---|
| | Mar | 9 | 24.00 | $1,041.12 |
| | Apr | 14 | 41.00 | $1,778.58 |
| | May | 16 | 41.00 | $1,778.58 |
| | Jun | 19 | 46.00 | $1,995.48 |
| | Jul | 19 | 58.00 | $2,516.04 |
| | Aug | 22 | 75.00 | $3,253.50 |
| | Sep | 18 | 60.00 | $2,602.80 |
| | Oct | 20 | 73.00 | $3,166.74 |
| | Nov | 16 | 62.00 | $2,689.56 |
| | Dec | 17 | 66.00 | $2,863.08 |
| **2017 Total** | | **191** | **610.00** | **$26,461.80** |
| 2018 | Jan | 20 | 72.00 | $3,123.36 |
| | Feb | 13 | 50.00 | $2,169.00 |
| | Mar | 15 | 58.00 | $2,582.92 |
| | Apr | 16 | 62.00 | $2,798.68 |
| | May | 18 | 70.00 | $3,159.80 |
| | Jun | 16 | 64.00 | $2,888.96 |
| | Jul | 16 | 62.00 | $2,822.98 |
| | Aug | 15 | 60.00 | $2,735.40 |
| | Sep | 12 | 48.00 | $2,188.32 |
| | Oct | 18 | 72.00 | $3,282.48 |
| | Nov | 16 | 64.00 | $2,917.76 |
| | Dec | 18 | 72.00 | $3,282.48 |
| **2018 Total** | | **193** | **754.00** | **$33,952.14** |
| 2019 | Jan | 16 | 64.00 | $2,976.00 |
| | Feb | 12 | 46.00 | $2,139.00 |
| | Mar | 14 | 54.00 | $2,511.00 |
| | Apr | 1 | 4.00 | $186.00 |
| **2019 Total** | | **43** | **168.00** | **$7,812.00** |
| **Grand Total** | | **692** | **2,605.00** | **$113,309.59** |

## <u>ATTACHMENT A-1</u>
### <u>Target Telephone #1</u>

**Property to Be Searched**

This warrant applies to records and information associated with the cellular telephone assigned call number **(617) 312-2934**, that are stored at premises controlled by Verizon  Wireless ("the Provider"), headquartered in New Jersey, and that accepts service of process at Verizon Wireless, 180 Washington Valley Road, Bedminster, NJ 07921.

## ATTACHMENT B-1

### Particular Things to be Seized

**I.  Information to be Disclosed by the Provider**

This Order includes the information preserved pursuant to the preservation request dated

12/11/2019.

To the extent that the information described in Attachment A-1 is within the possession,

custody, or control of the Provider, including any information that has been deleted but is

still available to the Provider or that has been preserved pursuant to a request made under 18

U.S.C. § 2703(f), the Provider is required to disclose to the government the following

information pertaining to the Account listed in Attachment A for the time period January 1,

2017 to May 2019:

 a. The following information about the customers or subscribers of the Account:

  i. Names (including subscriber names, user names, and screen names);

  ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

  iii. Local and long distance telephone connection records;

  iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

  v. Length of service (including start date) and types of service utilized;

  vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

2

      vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

     viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records.

b.   All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

     i.   the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

     ii.   information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received as well as per-call measurement data (also known as the "real-time tool" or "RTT" data).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. §666, 18 U.S.C. § 1343; and 18 U.S.C. §1028A involving Marilyn Golisano, during the period January 1, 2016 through May 2019.  This information includes evidence concerning the location of the Target Telephone, the location of the user of the Target Telephone, and the identity of the user of the Target Telephone throughout that period.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the

government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by [**PROVIDER**], and my title is

_____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of [**PROVIDER**].  The attached records consist of _____ [**GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of [**PROVIDER**], and they were made by [**PROVIDER**] as a regular practice; and

b.      such records were generated by [**PROVIDER'S**] electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of [**PROVIDER**] in a manner to ensure that they are true duplicates of the original records; and

5

2.      the process or system is regularly verified by **[PROVIDER]**, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____         _____
Date                                     Signature